NOTICE

Decision filed 08/05/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240651-U

NO. 5-24-0651

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 23-CF-811 |
| | ) | |
| TOMIR L. JOHNSON, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HACKETT delivered the judgment of the court.
Justice Sholar concurred in the judgment.*

**ORDER**

¶ 1    *Held*:  We affirm the defendant's sentence where his sentence was not excessive and not unconstitutionally disproportionate under the Illinois Constitution.

¶ 2    Following the entry of a guilty plea, the defendant, Tomir L. Johnson, was convicted of one count of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2022)) and sentenced to 23 years in the Illinois Department of Corrections (IDOC). On appeal, the defendant argues that this court must reduce his sentence where his sentence either violates the proportionate penalties clause of the Illinois Constitution or is excessive. For the following reasons, we affirm.

_____

*Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

¶ 3                    I. BACKGROUND

¶ 4    The defendant's charges relate to the murder of DeCarlo Douglas on November 20, 2022, in Rantoul. On December 20, 2022, the defendant was arrested. The next day, the defendant, then 16 years old, was charged by indictment in juvenile court with four counts of first degree murder. *Id.* § 9-1(a)(1), (a)(3). That same day, the State filed a motion to permit the prosecution of the defendant in adult criminal court.

¶ 5    A. Hearings on the State's Motion to Permit Prosecution in Adult Criminal Court

¶ 6    The hearing on the State's motion took place over two days, May 22, 2023, and June 20, 2023. At the May 22 hearing, the State presented Officer Kyle Gretz of the Rantoul Police Department (RPD), who testified that, at about 1:40 p.m. on November 20, 2022, he and other officers were dispatched to 1104 Falcon Drive. Multiple witnesses had called 9-1-1 to report that an individual was lying unconscious on the ground and that an approximately 20-year-old male wearing a black hoodie had run from the scene. Upon arrival, officers found a handgun and a pair of flip-flops in the middle of the road to the south of the victim. A yellow Jeep was also present, and one or two spent shell casings were found on the Jeep's floorboard. Spent shell casings were also found in the roadway and in the grass around the Jeep. The shell casings appeared to be from two separate firearms.

¶ 7    Although officers rendered medical aid to the unconscious victim, DeCarlo Douglas, he showed no signs of life. Officer Gretz then observed two young males, the defendant and his brother, Tomari Johnson (Tomari), exiting an apartment on 1104 Falcon Drive. The defendant, who appeared to have been shot, held a bath towel to the left side of his lower abdomen, and the defendant's brother shouted for help. While they waited for the ambulance, Officer Gretz rendered

2

medical aid to the defendant and observed two gunshot wounds to the defendant's lower left abdomen. Officer Gretz later learned that the defendant had been shot six times.

¶ 8    Officer Gretz spoke with several witnesses in the area, most of whom lived in the apartments on 1104 Falcon Drive. Two witnesses told Officer Gretz that they heard an exchange of gunshots and saw an approximately 20-year-old African-American male in the area. One witness told Officer Gretz that the male was wearing a black hoodie and red shoes, and the other told Officer Gretz that the male ran behind the building at 1108 Falcon Drive. A third witness told Officer Gretz that he saw the victim stagger, drop the handgun, and fall to the ground in the middle of the street. A fourth witness told Officer Gretz that he saw a "tall guy" wearing all black arguing with another individual in the Jeep. This witness looked away and heard gunshots, and when he looked back at the scene, the individual inside the Jeep got out and stumbled to the ground while the "tall guy" fled the scene. A fifth witness told Officer Gretz that she heard a car door being slammed and saw three individuals around the Jeep, including the victim, shooting at one another. This witness said that the "kid/grown man" shooting at the victim was around 20 years old and was shooting "like he wanted [the victim] dead." The "kid/grown man" then fled towards 1108 Falcon as the victim got out of the Jeep holding the side of his body. A sixth witness, L.R., told Officer Gretz that she heard gunshots, looked out of her window, and saw a black male wearing a black hoodie and carrying a gun run past. The victim's two children, J.L. and D.D., had been inside the Jeep during the shooting, and L.R. secured the children in her apartment until the police arrived.

¶ 9    Officer Gretz spoke with J.L., who was seven years old, about what happened. Officer Gretz described J.L.'s communication as "very sound" and "straight to the point." J.L. told Officer Gretz that he, his little brother (D.D.), and his father (the victim) drove up from Urbana so that his father could sell drugs and make some money. J.L. recounted that the defendant and his brother

3

had approached his father, with one standing in front of his father and the other standing to his father's left side. J.L. said that the boys placed a handgun to his father's head and shot him, and that his father ran so fast that he lost his sandals. Officer Gretz testified that J.L.'s recollection about his father's sandals was consistent with the flip-flops in the middle of the roadway, but admitted that the victim had not been shot in the head and that no witness could independently confirm that the boys had walked up and placed a gun to the victim's head. J.L. said that after his father was shot, J.L. got out of the car and ran to L.R.'s apartment while one shooter ran behind the Jeep and the other ran behind the 1108 Falcon building. Officer Gretz testified that J.L.'s recollection was consistent with what he had been told by other witnesses. J.L. told Officer Gretz that the shooters' gun was similar to his father's, that his father used his gun for self-defense and protection, and that his father did not have his gun that day. Officer Gretz admitted that J.L. was mistaken, as the victim did have a gun that day. Officer Gretz also admitted that no witness could tell him which individual had fired the first shot.

¶ 10 Detective James Barnett of the RPD testified that he conducted data extractions on the defendant's and the victim's cell phones. From the victim's iPhone, Detective Barnett could tell that the victim and Tomari had texted extensively on November 19 and 20 about facilitating a marijuana purchase. At 12:16 p.m. on November 20, Tomari texted the victim to come to 1103 Falcon Way for a $240 marijuana purchase. The victim texted back that he would arrive at Falcon Way in a yellow Jeep in approximately 15 minutes. On the defendant's iPhone, Detective Barnett viewed several text conversations between the defendant and Tomari referencing firearms; and Snapchat group chat conversations between the defendant, Tomari, and other individuals referencing plans to commit robberies and containing several videos of the defendant and Tomari casually handling, posing with, and shooting firearms. On cross-examination, Detective Barnett

4

admitted that he never saw any discussions about robbing the victim, and that neither the defendant nor Tomari had ever initiated discussions about robbing any individual.

¶ 11    At this point, the State played a video of J.L.'s Children's Advocacy Center (CAC) interview for the court. In the video, J.L. said that he was seven years old and in the second grade. He lived with his mom, his dad (the victim), and his two little brothers. J.L. told the CAC interviewer that, at his house on the morning of the murder, his father had spoken with buyers over the phone. His father had asked the buyers if they wanted what he was selling, hung up, called back, and made sure with the buyers that "this [was] not a game." J.L. did not know what his father was selling. J.L., his father, and one of his little brothers got into the car and drove until they stopped.

¶ 12    When they stopped, the victim opened his door and stood outside by it. Two boys walked up, and one had his hands and a gun in his pocket. J.L. described hearing the sound of a gun being cocked. The armed boy was black, had short dreadlocks, and was wearing a black hoodie underneath and a grey, red, and white Nike sweatshirt on top. The armed boy ran over to the victim's left side and pointed a small black gun at the victim's head. The other boy stood in front of the Jeep. J.L. described how his father looked at the boy with a gun to his head, ran, and fell and slid on the ground. Because of the way his father fell forward on the ground, J.L. believed his father had probably been shot in the chest, not the head. J.L. believed that he heard 10 shots in total. At this point, J.L. and his little brother were still in the Jeep's backseat, but J.L. believed that nobody had seen them.

¶ 13    After his father had been shot and fell on the ground, many people began to gather around the car. Inside the Jeep, J.L. used his father's phone to call 9-1-1. When bystanders realized that children were in the Jeep, they reacted with shock and told J.L. to come outside. As J.L. exited the

Jeep, he saw that there were "two bullets" in the car, and that a gun and his father's sandals were on the ground. An adult woman then took J.L. and his little brother to her apartment.

¶ 14 Detective Matthew Bross of the RPD testified that, on November 20, 2022, he went to the Carle Hospital emergency department to speak with the defendant, who had sustained six gunshot wounds to the torso, pelvis, and legs. Detective Bross was only able to speak briefly with the defendant because the defendant was being prepared for surgery. The defendant seemed to be in a lot of pain and repeatedly asked Detective Bross why he had been shot. When Detective Bross asked the defendant who had shot him, the defendant responded, "yellow." At that point, the defendant was taken away to the operating room, and Detective Bross spoke with the boys' grandmother, Tamera Schneider. Schneider told Detective Bross that she had dropped the boys off in Rantoul on November 18 to visit a friend, and that she was supposed to pick them up that day in an area one mile south of where the shooting had occurred. On November 22, Detective Bross attended the victim's autopsy and learned that the victim had been shot twice, with the fatal shot going "in the back and out the chest." Detective Bross confirmed that the victim had been armed. This concluded the State's evidence on the motion.

¶ 15 At a hearing on June 20, 2023, the defendant presented his evidence on the State's motion. Dr. Oluwatamilore Odimayo, a therapist and evaluator, testified as an expert in forensic evaluations. Dr. Odimayo confirmed that he had extensive experience evaluating juveniles and that he kept up to date on the research surrounding juvenile criminal behavior and brain development. Dr. Odimayo testified that the accepted opinion in his field was that, regardless of the severity of the offense committed, all children could be rehabilitated. Dr. Odimayo evaluated the defendant in person for a total of four hours. Dr. Odimayo administered the Adverse Childhood Experience (ACE) survey to the defendant, a questionnaire which evaluated physical, emotional,

6

and sexual trauma. The average American child scored a 4 on the ACE survey; the defendant scored a 10, the highest score possible. Dr. Odimayo recalled that he was "shocked" by the defendant's score because he had conducted the ACE survey for 10 years but had never before seen such a high score. Dr. Odimayo reviewed police records and orders of protection involving the defendant's parents, over 1,000 pages of abuse and neglect record information, school disciplinary and transcript records, and a separate doctor's psychological assessment diagnosing the defendant with attention-deficit/hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD). Dr. Odimayo testified that "it took a lot for [him] to read through some of the DCFS reports" regarding the defendant's childhood, which included significant physical, emotional, and sexual abuse, as well as neglect.

¶ 16    Dr. Odimayo testified that, after reviewing the police reports and witness interviews, he believed the defendant's story that the victim had shot the defendant first and the defendant had only returned fire out of fear for his brother. Dr. Odimayo opined that the defendant had been improperly diagnosed with ADHD and ODD, when he should have been diagnosed with post-traumatic stress disorder (PTSD) caused by the "years and years of childhood trauma that he experienced from his father and those who were supposed to care for him." Due to this improper diagnosis, the defendant had not been effectively treated for his condition. Despite this, the defendant was capable of rehabilitation and expressed a willingness to engage in treatment. Dr. Odimayo opined that, since the defendant's most recent residential placement with his grandmother, his behavior, grades, and disciplinary history had markedly improved. Dr. Odimayo testified that his opinion regarding the defendant's capacity for rehabilitation was unaffected by the videos of the defendant casually posing with firearms because, in his experience, teenage boys often engaged in such behavior to "seem cool." Finally, Dr. Odimayo insisted that, if he "did see

7

that [the defendant] was a danger to society," his opinion would have been "completely different." However, based on his evaluation, Dr. Odimayo concluded that the defendant was empathetic, protective, and loving toward others. Dr. Odimayo cited a school report of the defendant trying to help a teacher out with a misbehaving student. On cross-examination, Dr. Odimayo admitted that the defendant had previously refused to take prescribed medication, and that "a significant amount of services" had been provided to the defendant "through DCFS, the school system, and the criminal justice system."

¶ 17    Greg Jahiel testified that he was a social worker and student support services coordinator at the READY Program, an alternative school serving public school students from Champaign and Ford Counties. Students were placed in alternative schools based on a variety of criteria, including "expulsion, suspension, truancy, [and] just general difficulty in school." In 2018, the defendant was moved to the READY Program for sixth grade due to "disruptive behavior at his home school." Jahiel became the defendant's official social worker in 2022, but was very familiar with the defendant before that. Jahiel knew that the defendant had "experienced a lot of trauma," that he "moved a lot," and that he "just had a very, very unstable upbringing, very chaotic upbringing, and [had] just been through a lot." The defendant willingly saw a professional counselor for therapy once a week. Although the services provided through the READY Program were beneficial to the defendant, Jahiel did not believe that they were enough to fully deal with the defendant's trauma and behavioral issues. Over the four years the defendant had participated in the READY Program, Jahiel had seen significant improvements in the defendant's behavior and interest in education. Jahiel testified that "this last year was actually the best year [the defendant has] had. He didn't get any office referrals this year, and his grades were *** overall, pretty solid."

¶ 18    Jahiel testified that the defendant stood up for his classmates and teachers. In one instance, Jahiel recalled, the defendant's teacher was being disrespected by another student. The defendant "stood up for [his teacher] and told the other student to stop." Jahiel had witnessed the defendant standing up for bullied students "several times." Jahiel recalled one instance where the defendant voluntarily started pushing a new student in her wheelchair from class to class. Jahiel was particularly impressed by the defendant's acceptance of responsibility for actions he had taken in the past, and by his willingness to attempt to remedy the issues.

¶ 19    Jahiel and the defendant's therapist visited the defendant weekly during his incarceration. Jahiel did not visit all of his incarcerated students, but visited the defendant specifically because the defendant had "so much potential," and Jahiel "wanted to make sure that [the defendant] knew that there *** are adults that believe in him, and that see the good that's in him." Jahiel testified that the defendant felt "shocked and remorseful" about the situation. On cross-examination, Jahiel admitted that although the defendant's behavior had significantly improved since his placement in the READY Program, the defendant still struggled with managing his temper and with impulsivity.

¶ 20    Antonio Lenow Jr. testified that, in November 2022, he was working as a correctional officer at the Juvenile Detention Center (JDC). As a correctional officer, Lenow's duties generally involved spending time with and checking on the children while they played games and attended classes. Outside of class, the defendant often voluntarily worked on math problems with Lenow and demonstrated interest in increasing his mathematical skills. Lenow described the defendant as "very respectful" and testified that the defendant "gave [him] no issues [or] problems." Although the defendant did sometimes get frustrated with staff members and other children, Lenow testified that this was typical of teenagers, and that it usually only took a conversation for the defendant to rectify his behavior. Lenow testified that the defendant was motivated to learn, eagerly and

9

voluntarily participated in programs and classes, and was open and willing to change and improve himself. This concluded the defendant's evidence on the motion. After argument, the juvenile court took the matter under advisement.

¶ 21 On June 29, 2023, the juvenile court, in a memorandum opinion, granted the State's motion to permit the defendant's prosecution in adult criminal court. In its memorandum opinion, the juvenile court considered the factors required to be considered for discretionary transfer under section 5-805(3) of the Juvenile Court Act of 1987 (705 ILCS 405/5-805(3) (West 2022)). The juvenile court acknowledged that the statute required the court to place greater weight on the seriousness of the alleged offense and the minor's prior record of delinquency than to the other listed factors. *Id.* The court listed several factors weighing against and several factors weighing in favor of the State's motion.

¶ 22 Ultimately, the juvenile court concluded that, considering that "there was no information about whether [the] specific treatments" recommended by Dr. Odimayo were "available within the juvenile justice system"; the juvenile system would only have five years to rehabilitate the defendant before his release; and the statutory factors, including the defendant's age and the seriousness of the offense, weighed in favor of granting the State's motion, there was not a reasonable likelihood that the defendant could be rehabilitated within the time remaining, and it was therefore in the public's best interest that the defendant be prosecuted in adult criminal court.

¶ 23 On June 30, 2023, the State, in adult criminal court, charged the defendant by separate informations with five counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2022)), alleging that the defendant shot and killed Douglas on November 20, 2022. The defendant's juvenile court cases were dismissed.

¶ 24 On January 16, 2024, the State charged the defendant by information with an additional count of aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), relating to the same November 20, 2022, incident. That same day, the defendant waived his right to a jury trial, and the trial court accepted the defendant's open plea of guilty to aggravated battery with a firearm. In exchange, the State dismissed the five counts of first degree murder.

¶ 25                                    B. Sentencing Hearing

¶ 26 On March 1, 2024, the trial court held a sentencing hearing. At the outset, the trial court clarified that the sentencing range for the defendant's conviction of aggravated battery with a firearm was 6 to 30 years, with a mandatory supervised release term of 3 years. The court stated that it had read, and would consider in sentencing, the juvenile court's memorandum opinion order granting the State's motion to permit the defendant's prosecution in adult criminal court.

¶ 27 Sergeant James Schmidt of the RPD testified that, at about 1:30 p.m. on November 20, 2022, he went to the 1100 block of Falcon Drive to investigate the homicide. By the time he arrived, the victim had already been pronounced deceased. Officer Gretz went to speak with J.L. at L.R.'s apartment. At this point, body camera footage of Officer Gretz's conversation with J.L. was played for the court. In the video, J.L. told Officer Gretz substantially the same story that he later recalled in his CAC interview, except that J.L. told Officer Gretz that his father had been shot in the head. Additional details J.L. provided to Officer Gretz in this footage included that his father was selling "smoke," which J.L. described as "little green pieces"; that his father owned a gun for protection but had not brought it to the transaction and did not shoot at all; that his father had only been shot once; that, after being shot, his father had run so fast he lost his shoes before falling to the ground; that the boys had also run away; and that there was only one gun and one shooter.

11

¶ 28    Sergeant Schmidt testified that J.L.'s recollection of the incident as captured on the body camera footage was mostly accurate, in that a pair of black flip-flops were found in the roadway, the yellow Jeep had two bullet holes in it, and close to 10 shell casings were found at the scene. However, J.L. mistakenly believed that his father did not possess or fire a gun, as the victim did indeed have a .40-caliber firearm and at least two .40-caliber shell casings were found at the scene.

¶ 29    Detective Barnett testified that at about 7 a.m. on December 20, 2022, he was present when U.S. Marshals executed an arrest warrant on the defendant and Tomari at a Champaign residence. At this point, body camera footage of the defendant's December 20, 2022, arrest was played for the court. In the video, the defendant sat on the front porch steps with his hands handcuffed behind his back. He accused the Marshals of kicking down his family's front door and throwing him to the ground despite his obedient exit out of the house and his current state of post-surgery recovery. The defendant insisted that he had not murdered anyone and that he had just been waiting for his grandmother when he was shot.

¶ 30    Prior to the arrest, Detective Barnett conducted forensic data extractions of the defendant's and victim's cell phones. The defendant's cell phone had been seized while the defendant was in the hospital. Detective Barnett found videos of the defendant casually posing with and handling firearms, including from November 19, 2022, just one day before the murder. Two 9-millimeter firearms were among the firearms depicted in these videos. On the victim's cell phone, Detective Barnett found a text conversation between the victim and Tomari wherein the victim agreed to meet Tomari in Rantoul on November 20, 2022, so that Tomari could purchase cannabis from the victim. On cross-examination, Detective Barnett admitted that it was "fairly common" to find pictures and videos of people holding firearms upon extracting their cell phone data.

¶ 31    Victim impact statements from the victim's parents and son, J.L., were then read aloud for the court. Afterwards, Jahiel testified similarly to his testimony at the hearing on the State's motion to permit the defendant's prosecution in adult criminal court. Additionally, Jahiel insisted that the defendant was willing to engage in treatment and "really valued school, even though [the defendant] struggled, especially in the beginning." The defendant "wanted to do well" and "made a lot of effort." The defendant had a "pretty lengthy" individualized education plan (IEP) for an emotional disability, which indicated that the defendant "performed well with regards to his peers, but not necessarily towards *** himself." Jahiel testified that while he had not been aware of the defendant's making of videos with guns in his spare time, such behavior was not unusual based on the defendant's age and circumstances. The videos did not change Jahiel's belief in the defendant, and Jahiel continued to meet with the defendant during his incarceration because the defendant had "a goodness in him and an intelligence in him *** and a potential in him that [was] *** quite special." Jahiel testified that the defendant "expressed remorse" and "hopelessness" over the murder.

¶ 32    The trial court indicated that it would consider the testimony and evidence presented, including the defendant's most recent progress report from the juvenile detention center, in making a sentencing determination. The State recognized that the trial court was required to consider the statutory factors in mitigation and aggravation under sections 5-5-3.1 and 5-5-3.2 of the Unified Code of Corrections (Code) (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2020)). The State added that, since the defendant had been under 18 at the time of the offense, the trial court was also required to consider additional mitigating factors under section 5-4.5-105 of the Code (*id.* § 5-4.5-105). The State asserted that the juvenile court had already considered these factors in its memorandum opinion ruling on the transfer to adult criminal court, and asked the trial court to take judicial notice

13

of and consider the juvenile court's earlier order. The State also commented that the plea deal allowing the defendant to plead to aggravated battery with a firearm, rather than first degree murder, was already "a consideration of the aggravation and mitigation provided by [the defendant's] background and circumstances," giving the defendant "the benefit of what he's experienced by changing this from a case that carried a sentence of 20 to 50, with an additional mandatory 25, to 6 to 30." The State also asked the court to consider that, under Illinois statute, youthful offenders like the defendant were eligible to be considered for parole after 10 years if they could show that they had been rehabilitated. See *id.* § 5-4.5-115. The State asked the court to fashion the defendant's sentence with the aim of protecting the public, acknowledging the serious harm the defendant had caused, and deterring other young people from arming themselves with deadly weapons and committing similar crimes. The State recommended a sentence of 28 years in the IDOC. The State acknowledged that 28 years was "close to the maximum sentence available," but argued that it was appropriate because the State had "already taken into account all of the mitigation" through the defendant's plea deal.

¶ 33 Defense counsel argued that the trial court should not take the statutory opportunity for parole under consideration when fashioning the defendant's sentence, as counsel was not "aware of any case" where similar youthful offender statutes allowing early parole opportunities had ever actually been applied in a defendant's favor. Counsel argued that, in any case, the IDOC lacked the capability to rehabilitate the defendant, as it lacked several programs the defendant needed, and that the trial court should assume "that whatever sentence the court imposes is going to be fully served." In mitigation, defense counsel emphasized that the defendant had been removed from his family at the age of two after a domestic violence incident, and had, from that time onwards, never enjoyed "an ounce of stability." The defendant was regularly exposed to domestic

14

violence and substance abuse and was himself a victim of domestic violence. Defense counsel also pointed out that although the defendant's case had proceeded in adult court, the defendant was still only 15 when the crime occurred, and "the studies all agree that, when you are a teenager, especially a young teenager, your brain is not fully developed."

¶ 34　Counsel also clarified that the defendant's acceptance of the plea deal was "not a concession that he [was] responsible for the shot being fired first." In fact, the defendant had "six perforating bullet wounds" and ended up in surgery. Defense counsel argued that, "when [the defendant] was provided with the appropriate resources and when he was provided with a stable home environment for one of the first times in his life, he rose to the occasion, and he was on a better path when all of this happened." Counsel contended that the defendant had demonstrated his rehabilitative capacity through his youth detention center records, which showed that the defendant had "taken advantage of every single class[ ] [and] every single opportunity to reflect and self-improve." Counsel also pointed to the defendant's reported empathy and "the fact that he always tries to help others." Counsel reminded the court that "the goal of sentencing is, if possible, to restore the defendant to useful citizenship." Counsel also argued against the importance of deterrence as an aggravating factor here, because the group of people the deterrence was aimed at did not have "fully formed frontal lobes." Counsel asked the court to sentence the defendant "as close to the minimum as it [felt] comfortable." The defendant then read out a statement in allocution to the court detailing his remorse surrounding the victim's death and his commitment to rehabilitation.

¶ 35　The trial court then issued its ruling. In making its findings, the court first commented that it was worn out by "[t]he number of times that [it had] been told by a young man *** that they were carrying a gun for their protection." The court acknowledged that it could not "possibly know

15

from the evidence that [it had] been presented who fired the first shot." The court also acknowledged that it had "read about two inches of documents" on the defendant's abuse and neglect, and that "to describe [the defendant's] childhood as traumatic [did not] even begin to come close."

¶ 36 As to aggravation factors, the court noted that the defendant had a history of prior delinquency or criminal activity, but acknowledged that, for most of the defendant's life, "in spite of the horrendous start that he had in this world," the defendant had "led a law-abiding life for substantial periods of time." The court, despite acknowledging that the effectiveness of a lengthy sentence as deterrence was questionable, stated that deterrence was "a very significant factor [it would] consider in aggravation." The court acknowledged that there was "much mitigation in this record," including the fact that the defendant did not contemplate that his conduct would cause or threaten serious harm. The court also considered "the reduction in the maximum penalties" to be a serious factor that had "been baked into [the] partial plea agreement to some *** degree." When addressing the factor of whether the defendant's conduct was the result of circumstances unlikely to recur, the court commented that it believed that the defendant's behavior in reading his statement of allocution weighed against recurrence, but that the defendant's behavior in videos weighed in favor of it. The court acknowledged that the defendant's behavior in custody had been "exemplary," but speculated that the defendant's behavior was as much due to the defendant's desire to improve himself as it was to the fact that there was nothing else to do.

¶ 37 On the defendant's age at the time of the crime, a factor the trial court was required to consider due to the defendant's status as a minor, the court commented that the defendant had only been a couple of weeks shy of 16, and, though he was still a juvenile two years from adulthood, he was also only a couple of weeks away from automatic transfer to adult criminal court. The court

16

concluded that the age factor was "not an overwhelmingly strong factor in mitigation." The court acknowledged the defendant's traumatic background as a strong mitigating factor, and that the defendant had "plenty of" rehabilitative potential, as evidenced by the programs he had completed in custody. Recalling the stories about the defendant at the READY Program, the court commented that "[t]hose things [were] all very impressive, significant factors in mitigation, but they also [made] it hard for [the court] to wrap [its] head around that person that [did] those things [being] the same person that did this and got here today." The court opined that, "[c]learly, there's posttraumatic stress disorder," and acknowledged the defendant's expression of remorse.

¶ 38 In making its finding, the trial court commented that the "two most strong factors in aggravation were the deterrent effect" and a desire to protect the public. The court acknowledged that those factors had to be balanced "against an avalanche of mitigation." After considering the presentence investigation report, the evidence, the defendant's statement in allocution, counsels' arguments, the defendant's character and history, the seriousness of the offense, and "all statutory and non-statutory factors in aggravation and mitigation, whether specifically mentioned or not," the court determined that, even with the objective of restoring the defendant to useful citizenship, the proper sentence for the defendant was 23 years in the IDOC, to be followed by 3 years of mandatory supervised release. The court reminded the defendant that he would be eligible to apply for parole in 10 years, but acknowledged that "[n]one of us have any idea how that new program is gonna play out."

¶ 39 On April 12, 2024, the defendant filed a motion for reconsideration of sentence, arguing that: (1) his sentence was excessive, (2) his sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), and (3) the trial court improperly weighed the aggravating and mitigating factors in fashioning the defendant's sentence. On May 15, 2024,

17

the trial court held a hearing on the defendant's motion. Defense counsel reminded the trial court that it had acknowledged that there was an "avalanche of mitigation" in the defendant's case, and argued that the defendant's 23-year sentence was excessive. The trial court, however, was "not persuaded by this argument that [it] was incorrect or inappropriately applied the factors in aggravation and mitigation," and denied the defendant's motion. The defendant appeals.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, the defendant contends that the trial court improperly applied sentencing factors in such a way that either (1) violated the Illinois Constitution's proportionate penalties clause or (2) constituted an abuse of discretion resulting in an excessive sentence.

¶ 42                         A. Proportionate Penalties Clause

¶ 43    The defendant first claims that his sentence violates the proportionate penalties clause of the Illinois Constitution, which requires that all penalties "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. We review whether a sentence violates the proportionate penalties clause *de novo*. *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 67.

¶ 44    A sentence of "any length" can violate the Illinois Constitution's proportionate penalties clause. *People v. Hilliard*, 2023 IL 128186, ¶ 29. A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." (Internal quotation marks omitted.) *Id.* ¶ 20. The proportionate penalties clause requires trial courts to consider the defendant's youth and mentality in fashioning an appropriate sentence. *People v. Clark*, 2023 IL 127273, ¶ 92. In fact, where the defendant was under 18 at the time of the offense, the trial court must consider specific mitigating sentencing

18

factors first identified in *Miller*[1] and now codified under section 5-4.5-105(a) of the Code (730

ILCS 5/5-4.5-105(a) (West 2020)), which reads as follows:

> "On or after the effective date of this amendatory Act of the 99th General Assembly, when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing conducted under Section 5-4-1, shall consider the following additional factors in mitigation in determining the appropriate sentence:
>
> > (1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;
> >
> > (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;
> >
> > (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;
> >
> > (4) the person's potential for rehabilitation or evidence of rehabilitation, or both;
> >
> > (5) the circumstances of the offense;
> >
> > (6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;
> >
> > (7) whether the person was able to meaningfully participate in his or her defense;
> >
> > (8) the person's prior juvenile or criminal history; and
> >
> > (9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor."

¶ 45    Here, the defendant contends that the trial court failed to properly consider his age and level of maturity, and potential for, and evidence of, rehabilitation. The defendant also contends

---

[1]See *Miller v. Alabama*, 567 U.S. 460 (2012).

that the trial court improperly applied the need for deterrence as a factor in aggravation. We disagree.

¶ 46    During the sentencing hearing, the trial court specifically considered the defendant's age and level of maturity, acknowledging that the defendant was still a juvenile and had only been 15 at the time of the offense. However, the court also commented that the defendant was only a couple of weeks shy of 16 at the time of the offense and had therefore been very close to the age when juveniles were automatically transferred to adult criminal court. After consideration, the court ultimately concluded that the factor of the defendant's age was "not an overwhelmingly strong factor in mitigation."

¶ 47    The trial court also specifically asserted that the defendant had "plenty of" rehabilitative potential, noting that, "in spite of the horrendous start that [the defendant] had in this world," he had "led a law-abiding life for substantial periods of time"; his behavior in custody had been "exemplary"; and witnesses recounted "impressive, significant" stories of the defendant's empathy toward others at the READY program.

¶ 48    The defendant points out that, in *Miller*, 567 U.S. at 472, the Supreme Court stated that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." However, the Supreme Court has never declared deterrence to be an improper or irrelevant factor in juvenile sentencing. Here, the court specifically acknowledged the lowered efficacy of lengthy sentences as deterrence among juveniles, but nonetheless chose, in its judgment, to consider the need for deterrence in sentencing the defendant.

¶ 49    Ultimately, on *de novo* review, we do not find that the trial court improperly applied sentencing factors in such a way that violated the proportionate penalties clause, or that the

20

defendant's sentence of 23 years was cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.

¶ 50                                B. Excessive Sentence

¶ 51    The defendant next contends that his sentence is excessive. A trial court's sentencing decisions are afforded great deference because the trial court is generally in a better position to weigh the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26. Absent an abuse of discretion, a sentence within statutory limits will not be deemed excessive. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). A trial court abuses its sentencing discretion when the penalty imposed "is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense" (*People v. Stacey*, 193 Ill. 2d 203, 210 (2000)), or where the court's sentencing ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court" (*Etherton*, 2017 IL App (5th) 140427, ¶ 26). We will not find an abuse of discretion and substitute our judgment for that of the trial court merely because we would have weighed the factors differently. See *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010).

¶ 52    Here, the defendant's 23-year sentence was within statutory limits, as the sentencing range for the defendant's conviction of aggravated battery with a firearm was 6 to 30 years. The defendant contends that the trial court improperly applied sentencing factors in such a way that constituted an abuse of discretion and resulted in an excessive sentence. As discussed above, although it did not weigh them in the defendant's favor, the trial court did properly consider the required sentencing factors.[2] We cannot find that the defendant's 23-year sentence was greatly at

---

[2]*Supra* ¶¶ 45-48.

variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. We similarly do not find that the court's sentencing ruling was arbitrary, fanciful, unreasonable, or that no reasonable person would take the view adopted by the trial court. We do not find an abuse of discretion.

¶ 53                                    III. CONCLUSION

¶ 54     We affirm the defendant's conviction and sentence where the defendant's sentence was neither violative of the proportionate penalties clause of the Illinois Constitution nor excessive.


¶ 55     Affirmed.